KERBECK CADILLAC PONTIAC, INC. d/b/a Kerbeck Cadillac Chevrolet, Petitioner

v.

STATE BOARD OF VEHICLE MAN-UFACTURERS, DEALERS AND SALESPERSONS, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 8, 2004.
Decided July 22, 2004.

Joseph C. Crawford and Kynya V. Manning, Philadelphia, for petitioner.

Thomas A. Blackburn, Harrisburg, for respondent.

Donald Kaufman and Kandice Giurintano, Harrisburg, for amicus curiae, PA Automotive Assoc.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, and COHN, Judge.

OPINION BY Judge McGINLEY.

Kerbeck Cadillac Pontiac, Inc. d/b/a/ Kerbeck Cadillac Chevrolet (Kerbeck) petitions for review from an order of the State Board of Vehicle Manufacturers, Dealers and Salespersons (Board) that imposed a civil penalty in the amount of $1,000.00 against Kerbeck and directed that Kerbeck cease and desist from participation in vehicle shows, off-premise sales or exhibitions in Pennsylvania.

On January 23, 2002, the Pennsylvania Bureau of Professional and Occupational Affairs (Commonwealth) filed an amended order to show cause and alleged:

> 8. Since at least 1998, the Respondent [Kerbeck] has been the only new vehicle dealer at the Corvettes at Carlisle event.
>
> . . . .
>
> 35. Based upon the foregoing Factual Allegations, the Respondent [Kerbeck] violated the Act at 63 P.S. § 818.32 and 63 P.S. § 818.19(26) in that Respondent [Kerbeck] violated the Board of Vehicles Act in that the Respondent [Kerbeck] is an out-of-state new vehicle dealer who participated in off-premise vehicle sales and/or exhibitions in the Commonwealth where there were not fifty (50) or more new vehicle dealers participating as exhibitors.

Amended Order To Show Cause, January 23, 2002, Paragraphs 8 and 35 at 5; Reproduced Record (R.R.) at 27a.

Kerbeck filed an answer and asserted: 1) that "as a matter of law, [it] did not violate the Act as alleged by the Board"; 2) that "[t]he Board's interpretation of the Act is barred on the ground that the Board has enforced the Act in a selective, discriminatory and unlawful manner"; 3) that "[t]he Board's claim of a violation of Section 818.32 of the Act is barred on the ground that the Board has made no allegation, and has no proof, that less than 50 new Corvette dealers participated in the annual events"; and 4) that "Kerbeck reiterates that the Act, if applied in the manner asserted in the Board's Order to Show Cause, is unconstitutional both on its face and in its application to Kerbeck because

the Act violates the Commerce Clause of the United States Constitution." Respondent Kerbeck Cadillac's Answer To Board's Amended Order To Show Cause, February 24, 2003, Respondent's Affirmative Defenses And Reservations of Rights at 5–7; R.R. at 49a–51a.

At hearing, John Detrick (Detrick), CEO of Carlisle Productions, testified that his former duties as director included "sales development, and creating and developing a sponsorship program for the company." Notes of Testimony (N.T.), April 10, 2003, at 21; R.R. at 166a. Detrick testified that Kerbeck was the only new vehicle dealer to participate in the "Corvettes of Carlisle" event from 1999 through 2002.[1]

Charles Kerbeck (Charles) and George Kerbeck (George) testified on behalf of Kerbeck.[2] Charles stated that "[w]e will not sell a car at the show … [w]e will not take one penny of their money … except to tell them that the car will be back in Atlantic City after the show … [a]nd at that point, it can be bought." N.T. at 134; R.R. at 279a.

George testified that he prepared a list of the dealers for the 2002 Corvettes at Carlisle event and that "[w]ell I stopped at 51, but there could be 150 based on those individual names that are dealers." N.T. at 153; R.R. at 298. George acknowledged on cross-examination that "several of them we know are new car dealers, but there are others that could be new dealers, but I couldn't be for sure." N.T. at 154; R.R. at 299a.

The Board made the following relevant findings of fact:

1. Respondent [Kerbeck] holds no vehicle dealer license in the Commonwealth of Pennsylvania. (Exhibit C–1); exhibits C–2 and C–3 at § 1).

2. At all times pertinent to this matter, Respondent [Kerbeck] did not hold a vehicle dealer license in the Commonwealth of Pennsylvania. (Exhibits C–2 and C–3 at § 2).

3. Respondent's (Kerbeck's) address is 430 North Albany Avenue, Atlantic City, NJ 08401. (Exhibits C–2 and C–3 at § 3).

4. Respondent [Kerbeck] is licensed as a new vehicle dealer in New Jersey. (Exhibits C–2 and C–3 at § 5).

5. Respondent [Kerbeck] has participated at the Corvettes at Carlisle event in Carlisle, Pennsylvania, annually from 1998 through 2002, displaying new and

---

1. Denise Miller–Tshudy, attorney for the Commonwealth, to Detrick:

 Q: Mr. Detrick, to your knowledge, how many new vehicle dealers participate in Corvettes of Carlisle each year?
 A: I have no way of knowing an actual number. *As a matter of fact, the only one that I know of is Kerbeck.*
 Q: Okay. And would that be for all of the year 2000—or would that be your knowledge in—for the year 1999 show?
 A: Yes.
 Q: And what about the 2000 show?
 A: Yes.
 Q: 2001?
 A: Yes.
 Q: And 2002?
 A: Yes.

N.T. at 43; R.R. at 188a (emphasis added).

2. Joseph Sutliff (Sutliff), President of Sutliff Chevrolet, Co., and Paul McMillan (McMillan), Executive Vice–President of the Pennsylvania Automotive Association (PAA), were called by Kerbeck as hostile witnesses. Sutliff testified that his dealership is within the twenty mile radius as required by law and that he was unaware of any specific dealership participating in the Corvettes at Carlisle event that was beyond the twenty mile radius. *See* N.T. at 94–95; R.R. at 239a–40a.

McMillan testified that he did not know if there were fifty new vehicle dealers that attended the Corvettes at Carlisle event. *See* N.T. at 123–24; R.R. at 268a–69a.

used Corvettes at each year's event (Exhibit C–2 and C–3 at §§ 6, 9, 25 and 26).

6. Respondent [Kerbeck] provided employees, including trained product specialist, each year at the Corvettes at Carlisle event to answer questions about heritage, engineering and styling of Corvettes. (Exhibit C–3 at §§ 27–29).

7. Respondent [Kerbeck] was the only new vehicle dealer to participate as an exhibitor at Corvettes at Carlisle during the time period from 1999 through 2002. (N.T. at 43).

The Board's Adjudication and Award, August 8, 2003, Findings of Fact (F.F.) Nos. 1–7 at 2. The Board determined that Kerbeck violated Section 32(c) of the Board of Vehicles Act (Act)[3], 63 P.S. § 818.32(c) and levied a civil penalty in the amount of $1000.00

■ On appeal[4], Kerbeck contends: 1) that Section 32(c) of the Act, 63 P.S. § 818.32(c) does not preclude an out-of-state new vehicle dealer from merely displaying vehicles at the Corvettes at Carlisle event (Event) unless there are forty-nine other new vehicle dealers present at the Event; 2) that the Commonwealth failed to establish that less than fifty new vehicle dealers participated at the Event; and 3) that the Act violates the Commerce Clause of the United States (U.S.) Constitution because it precludes out-of-state

new vehicle dealers from merely displaying vehicles at the Event. This Court shall address each argument seriatim.

## Whether The Board Correctly Interpreted The Act As Prohibiting Kerbeck From Displaying Vehicles At The Event?

■ Initially, Kerbeck contends that the Board incorrectly interpreted Section 32(c) of the Act, 63 P.S. § 818.32(c) when it determined that Kerbeck could not participate in the Event unless forty-nine other new vehicle dealers participated at the Event. Kerbeck asserts that such an interpretation is contrary to this Court's decision in *Spankey's Auto Sales, Inc. v. State Board of Vehicle Manufacturers, Dealers and Salespersons,* 773 A.2d 206 (Pa.Cmwlth.2001).

Section 32 (c) of the Act, 63 P.S. § 818.32(c) provides:

> Out–of–State New Vehicle Dealers.-A new vehicle dealer[5], except a recreational vehicle dealer, *licensed in another state or jurisdiction may participate with permission of its licensed manufacturer in industrywide public vehicle shows and exhibitions in which a total of 50 or more new vehicle dealers participated as exhibitors* . . . . (emphasis added).

---

**3.** Act of December 22, 1983, P.L. 306, *as amended.* Section 32(c) was added by the Act of July 3, 1987, P.L. 192.

**4.** This Court's review of a civil penalty imposed by the State Board of Vehicle Manufacturers, Dealers and Salespersons is limited to determining whether the Board violated the licensee's constitutional rights, committed an error of law, or based its conclusion on a material finding of fact that was not supported by substantial evidence. *Northern Associates, Inc. v. State Board of Vehicle Manufacturers, Dealers and Salespersons,* 725 A.2d 857 (Pa.Cmwlth.1999).

**5.** Section 2 of the Act, 63 P.S. § 818.2 defines the term "new vehicle dealer" as:

> [A] person engaged in the business of buying, selling or exchanging new and used vehicles, trailers, or semitrailers for commission, compensation or other consideration, who holds a franchise with a manufacturer or distributor, giving the dealer selling rights for that particular line-make of new vehicles, trailers or semitrailers, or who is a distributor of new vehicles, trailers or semitrailers who holds a franchise with a manufacturer or distributor of vehicles, trailers and semitrailers.

■ Section 32(c) of the Act, 63 P.S. § 818.32(c) clearly states that an out-of-state new vehicle dealer, with the permission of its manufacturer, "may participate" in shows where there are at least fifty new vehicle dealers participating as exhibitors. This limitation is applicable to out-of-state new vehicle dealers and applies even though the new vehicle dealer displays its vehicles and does not sell them. This is evidenced by Section 2 of the Act, 63 P .S. § 818.2 which defines the terms "off-premise sale", "vehicle show", or "exhibition" as "[a] sale, show or exhibition of one or more vehicle dealers, distributors, manufacturers or manufacturers' representatives *who display, sell or attempt to sell vehicles* . . . for a fixed and limited period of time held in the relevant market area of the participating dealers or distributors." (emphasis added). Interpreting the Act as a whole, the General Assembly chose not to distinguish between "displaying" and "selling" a vehicle at a show, event or exhibition, as suggested by Kerbeck, because either activity is intended by the vehicle dealers to eventually culminate in a sale. "In interpreting the statute in this way, we adhere to the well settled principle of construction that the language of the statute must be read in a sense which harmonizes with the subject matter and its general purpose and object." *Busy Beaver Building Centers, Inc. v. Tueche,* 295 Pa.Super. 504, 442 A.2d 252, 256 (1981). Therefore, the Board did not err as a matter of law when it determined that Section 32(c) of the Act prohibited Kerbeck from displaying its vehicles at the Event.

Kerbeck asserts that this Court rejected this interpretation of the Act in *Spankey's.* This Court disagrees. In *Spankey's,* Spankey's Auto Sales (Spankey's) was an used vehicle dealer with its primary lot in Mechanicsburg, Pennsylvania. On July 23, 1998, Spankey's had been cited for operating an unlicensed branch lot in violation of the Act.[6] Spankey's used the lease area to display one of its vehicles on a weekly basis. At the display area, business cards of sales representatives and brochures were distributed that listed all of Spankey's services. Sales representatives visited the area periodically to replace business cards and answer customer questions if approached. Spankey's specified that no sales were allowed at the display area. The board sustained the citation.

On appeal, this Court determined that Spankey's did not operate an unlicensed branch lot:

> We agree with Spankey's that its display of a vehicle at the Capital City Mall was merely an advertising technique which is customarily utilized in thousands of malls throughout the country. The display area in the mall did not, by any stretch of the imagination, constitute an "office" and a "lot" as required under the Act. . . . Because there was neither an office nor a lot at the display area in question, that area simply did not constitute a branch lot as that term is defined in the Act.

> Given our reasoning herein, the fact that the space Spankey's leased in the middle of the Capital City Mall was used for the display of vehicles is irrelevant. In our

---

6. Section 5 of the Act, 63 P.S. § 818.5 provides:

 **(a) Licensed required.-**
 (1) To promote the public safety and welfare, it shall be unlawful for any person to engage in the business as a sales person, dealer, branch lot, . . . within this Common-

wealth unless the person has secured a license as required under this act.
 Section 2 of the Act, 63 P.S. § 818.2 defines the term "branch lot" as "[a]n office and lot maintained in addition to the main office and lot of a licensed vehicle dealer used for the display or sale of vehicles."

estimation, the intent of the General Assembly in requiring licenses for branch lots is to prohibit already licensed dealers from opening additional lots without the proper additional licensure. Since no such prohibited activity occurred here, we reject the Board's argument that Spankey's was engaged in the *business* of a branch lot by displaying a vehicle at the local mall.

Accordingly, we reverse the decision of the Board and dismiss the citation issued to Spankey's. (emphasis in original and footnote omitted).

*Spankey's,* 773 A.2d at 209.

Here, a review of the facts indicates that *Spankey's* is distinguishable. First, in *Spankey's,* this Court reviewed Section 5 of the Act and not Section 32(c) of the Act. Second, this Court determined that the advertising in *Spankey's,* did not require a Pennsylvania licensed dealer to obtain a second license. Third, here, Kerbeck does not possess a Pennsylvania dealer license but is licensed in New Jersey. Finally, if the *Spankey's* rationale controlled here the result would be that any out-of-state new vehicle dealer could set up a vehicle display manned by sales and support staff at any location in Pennsylvania with the Board powerless to protect the interest of the Pennsylvania consumer should a sale occur out of state. This Court does not believe that our General Assembly intended such an absurd result.

**Was There Substantial Evidence To Support The Board's Finding That Less Than Fifty New Car Dealers Participated At The Event?**

■ Kerbeck next contends that Detrick's testimony failed to support such a finding by the Board. This Court disagrees.

Here, the Board found that Kerbeck was the only new vehicle dealer to participate as an exhibitor at the Event from 1999 through 2002. *See* F.F No. 7 at 2. In support of this finding, this Court concurs with the Board's rationale:

> Respondent [Kerbeck] argues that the Commonwealth failed to prove that fewer than 50 new vehicle dealers participated in Corvettes at Carlisle. Assuming without deciding that the Commonwealth bore the burden of proof on this fact, the evidence produced at the hearing by the Commonwealth was sufficient to establish that Respondent [Kerbeck] was the only new vehicle dealer to participate as an exhibitor. In order to participate as an exhibitor in Corvettes at Carlisle each year, Respondent [Kerbeck] paid the promoter a fee that increased each year from $7100 in 1998 to $10,900 in 2002. (See, exhibits C–4, C–7, C–9, C–11 and C–14). *The event promoter [Detrick], when asked how many new vehicle dealers participated in Corvettes at Carlisle each year, testified that for each year from 1999 through 2002 'the only one that I know of is [Respondent] [Kerbeck].' (N.T. at 43). If the promoter [Detrick] was not aware of any other dealer's participation, despite charging such fees, no other dealer could have been 'participat[ing] as an exhibitor' in these events, as required by section 32(c) of the Act.* (emphasis added).

The Board's Adjudication, Discussion at 7–8. The Board's F.F. No. 7 is supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Empire Steel Castings, Inc. v. Workers' Compensation Appeal Board (Cruceta),* 749 A.2d 1021, 1024 (Pa. Cmwlth.2000). On appellate review, the prevailing party is entitled to have the

benefit of the most favorable inferences deduced from the evidence. *Id.*

### Whether The Act Violates the Commerce Clause Of The United States Constitution?

 Lastly, Kerbeck contends that the Act is unconstitutional because it violates the Commerce Clause of the U.S. Constitution by prohibiting out-of-state new vehicle dealers from participating and displaying vehicles unless there are at least fifty new vehicle dealers present. Kerbeck asserts that this results in differential treatment between local new vehicle dealers and out-of-state new vehicle dealers.

 "Of course, we must be mindful of the presumption in favor of constitutionality of lawfully-enacted legislation, i.e., an act of assembly will not be declared unconstitutional unless it clearly, palpably and plainly violates the constitution." *Hayes v. Erie Insurance Exchange,* 493 Pa. 150, 155, 425 A.2d 419, 421 (1981), *citing Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 16, 331 A.2d 198, 203 (1975). "Any doubts are to be resolved in favor of sustaining the legislation." *Id.* at 155, 425 A.2d at 421.

The Commerce Clause provides that "Congress shall have power . . . [t]o regulate Commerce . . . among the several states. . . ." Article I, Section 8, Clause 3 of the U.S. Constitution. The United States Supreme Court noted:

In the absence of federal legislation, these subjects are open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself. *The bounds of these restraints appear nowhere in the Commerce Clause, but have emerged gradually in the decisions of this Court giving effect to its basic purpose.* (emphasis added and citations omitted)

*Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

In *Empire Sanitary Landfill v. Pennsylvania Department of Environmental Resources,* 546 Pa. 315, 684 A.2d 1047 (1996), our Pennsylvania Supreme Court conducted an extensive analysis of the Commerce Clause:

The Commerce Clause has a negative or dormant aspect which limits the power of the states to erect barriers against interstate trade where Congress has not affirmatively acted to either authorize or forbid the challenged state activity. . . . The dormant Commerce Clause doctrine serves to prevent a state from regulating business in such a way as to provide unfair advantage to its own residents at the expense of residents of another state. . . .

*Two tests are used in this type of Commerce Clause analysis: the strict scrutiny and the balancing tests.* (emphasis added).

*Id.* at 333, 684 A.2d at 1055.

### A. Strict Scrutiny Test

Kerbeck asserts that Section 32(c) of the Act, 63 P.S. § 818.32(c) facially discriminates against interstate commerce and as a result the strict scrutiny test applies.

 The strict scrutiny test applies where an ordinance facially discriminates against interstate commerce by creating "local economic protectionism." *C & A Carbone, Inc. v. Town of Clarkstown, New York,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1970). "Under strict scrutiny, a facially discriminatory ordinance almost always is deemed invalid unless the governmental entity defending the regulation establishes that the regulation advances a legitimate local public purpose and that there are no discriminatory alternatives available which adequately serve the local interests at stake." *Empire San-*

*itary Landfill,* 546 Pa. at 333, 684 A.2d at 1056, *citing C & A Carbone, Inc.*

In *Delaware County v. Raymond T. Opdenaker & Sons,* 652 A.2d 434 (Pa.Cmwlth. 1994), this Court recounted the factual situation and applied the strict scrutiny analysis that the United States Supreme Court set out in *C & A Carbone, Inc.:*

> In *Carbone,* the town of Clarkestown, New York, had a flow control ordinance requiring all solid waste be processed at a designated transfer station within Clarkestown before leaving the town. Clarkestown sought an injunction against other waste processors in the town, which were violating the ordinance by shipping or attempting to ship waste for further processing to sites in four other states. The avowed purpose of the ordinance was to retain the processing/tipping fees-set at eight-one dollars per ton, exceeding the fees available in the private market-charged at the transfer station to amortize the cost of the facility. *The Supreme Court wrote that, '[b]ecause it attains this goal by depriving competitors, including out-of-state firms, of access to a local market, we hold that the flow control ordinance violates the Commerce Clause.'* Id. at 385, 114 S.Ct. at 1680.
>
> Applying the preceding constitutional analysis in reaching its decision, the Supreme Court set out to 'confirm that the flow control ordinance does regulate interstate commerce.' Id. at 388, 114 S.Ct. at 1681. The Supreme Court concluded that, because the private processors received waste from places other than Clarkestown, including out-of-state sites, the requirement that the processors send waste to the town's transfer station at an additional cost [sic] drives up the cost for out-of-state interests to dispose of their solid wastes. Furthermore, even as to

waste originant in Clarkestown, the ordinance prevents everyone except the favored local operator from performing the initial processing step. *The ordinance thus deprives out-of-state businesses of access to a local market. These economic effects are more than enough to bring Clarkestown ordinance within the purview of the Commerce Clause.* It is well settled that actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow. *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 31 [57 S.Ct. 615, 621, 81 L.Ed. 893] (1937). (emphasis added).

*Carbone,* at 381–90, 114 S.Ct. at 1681–82.

Once the Supreme Court confirmed that the ordinance did regulate interstate commerce, the next question became whether the flow control ordinance is valid despite its undoubted effect on interstate commerce. For this inquiry, our case law yields two lines of analysis: first, whether the ordinance discriminates against interstate commerce, *Philadelphia [v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)]; and second, whether the ordinance imposes a burden on interstate commerce that is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). *If the courts determine that the first line of analysis is appropriate, i.e., the local law discriminates 'against interstate commerce in favor of local business or investment,' the law 'is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.' Carbone,* 511, U.S. at

392, 114 S.Ct. at 1683. Reasoning that the ordinance was discriminatory, the Supreme Court in Carbone, held that the Philadelphia line of analysis was appropriate. Pursuant to that analysis, the Court declared the ordinance invalid. (emphasis added).

*Delaware County,* 652 A.2d at 436–37.

A review of Section 32(c) when read in conjunction with Section 32(a) of the Act reflects that the Act is not facially discriminatory. Critically, Section 32(a) of the Act, 63 P.S. § 818 .32(a) prohibits in-state licensed new vehicle dealers from participating in an exhibition where the location is not within the new vehicle dealers' relevant market, i.e. "the area within a radius of 20 miles around an existing dealer or the area of responsibility defined in the franchise, whichever is greater." [7]

So, Section 32 of the Act places out-of-state new vehicle dealers on the same footing as in-state new vehicle dealers, outside of the "relevant market area," and subjects all new vehicle dealers to the same restric-

tions. Because in-state new vehicle dealers are equally as burdened as out-of-state new vehicle dealers, the Act does not facially discriminate against interstate commerce and the strict scrutiny test is inapplicable.

### B. The Balancing Test

This Court must now address whether Section 32(c) of the Act, 63 P.S. § 818.32(c) violates the Commerce Clause under the balancing test. Again, in *Empire Sanitary Landfill,* our Pennsylvania Supreme Court stated the balancing test analysis enunciated by the U .S. Supreme Court in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) [8]:

> Where an ordinance does not discriminate against interstate commerce either in purpose or effect, the ordinance will be upheld unless the burden imposed on interstate commerce is 'clearly excessive in relation to the putative local benefits.' *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178–79 (1970). In Pike, the Court

---

**7.** Section 2 (relevant market area) of the Act, 63 P.S. § 818.2.

**8.** In *Pike,* Bruce Church, Inc. (Bruce) was engaged in the business of growing, harvesting, processing, and packing fruits and vegetables at a number of locations in Arizona and California. At one plant located at Parker, Arizona, Bruce had no processing and packing operations for its cantaloupe crop. As a result, Bruce transported its 1966 cantaloupe crop in bulk loads to Blythe, California which was located thirty-one miles from Parker, Arizona. At Blythe, the cantaloupe crop was sorted, inspected, packed and shipped and this procedure was again repeated in 1967. In 1968, appellant Pike (Appellant) issued an order pursuant to the Arizona Fruit and Vegetable Standardization Act that required, with few exceptions, that all cantaloupes grown in Arizona and offered for sale must be packaged in closed standard containers and approved by a supervisor before the cantaloupes were shipped out-of-state. The United States District Court for the District of Arizona

granted a permanent injunction and held that Appellant's order constituted an unlawful burden upon interstate commerce.

The U.S. Supreme Court agreed:
While the order issued under the Arizona statute does not impose such rigidity on an entire industry, it does impose just such a straitjacket on the appellee company [Pike] with respect to the allocation of its interstate resources. Such an incidental consequence of a regulatory scheme could perhaps be tolerated if a more compelling state interest were involved. But here the State's interest is minimal at best—certainly less substantial than a State's interest in securing employment for its people. If the Commerce Clause forbids a State to require work to be done within its jurisdiction to promote local employment, then surely it cannot permit a State to require a person to go into a local packing business solely for the sake of enhancing the reputation of other producers within its borders.
*Pike,* 397 U.S. at 146, 90 S.Ct. 844.

directed that when reviewing dormant Commerce Clause challenges, courts must inquire as to:

(1) *whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce,* or discriminates against interstate commerce either on its face or in practical effect;

(2) *whether the statute serves a legitimate local purpose;* and, if so,

(3) *whether alternative means could promote this local purpose* as well without discriminating against interstate commerce. (citations and footnotes omitted and emphasis added).

*Id,* at 334, 684 A.2d at 1056. Therefore, the critical inquiry is whether Section 32(c) of the Act, as applied, burdens interstate commerce under the balancing test analysis in *Pike.*

As noted, Section 32 of the Act, 63 P.S. § 818.32 precludes in-state new vehicle dealers and out-of-state new vehicle dealers from participating in shows or exhibitions outside the dealership territory. This Court recognizes that the General Assembly enacted this prohibition for the legitimate purpose of protecting the Pennsylvania consumer. Specifically, the Act in general[9] protects the Pennsylvania consumer from fraud and deception in the purchase of a new vehicle and assures the consumer that the new vehicle dealer must provide fair service and reliable products. Because the Act serves a legitimate local purpose, the effect on interstate commerce is "incidental" and the burden small in comparison to the benefit to Pennsylvania consumers.

Accordingly, this Court affirms.

### ORDER

AND NOW, this 22nd day of July, 2004, the order of the State Board of Vehicle Manufacturers, Dealers and Salespersons in the above-captioned matter is affirmed.

DISSENTING OPINION BY PRESIDENT Judge COLINS.

I must respectfully dissent from the scholarly and well-written opinion of the majority.

Whether or not *Spankey's* is factually on point is of no moment, since the Board's enforcement of the Act in the instant matter is clearly violative of the Commerce Clause of the U.S. Constitution. Further, the Board's actions are an unreasonable restraint upon commercial speech which is protected by the First Amendment of the U.S. Constitution.

The record reflects that the "Corvettes at Carlisle" event produced $92 Million in revenues for the Commonwealth travel and tourism industry alone, and nearly $1 Billion over the preceding decade. Further, the Carlisle event drew an estimated 60,000 people in 2002.

I must agree with the Petitioner that this is precisely the sort of national free market enterprise that the Commerce Clause has been interpreted to protect from State protectionist policies.

Also, the display of the vehicle in question, in conjunction with the dissemination

---

9. As noted earlier, Section 5(a) of the Act, 63 P.S. § 818.5(a) requires that a salesperson or dealer must have a Pennsylvania license in order to promote the public safety and welfare of the Pennsylvania consumer. Section 5(e)(1) of the Act, 63 P.S. § 818.5(e)(1) provides that "[d]ealers and brokers engaged in the business of buying, selling, or exchanging new and used vehicles ... shall maintain a salesroom or garage devoted principally to the motor vehicle business and an established place of business ." (emphasis added). Also, Section 19(34) of the Act, 63 P.S. § 818.19(34) prohibits a licensed dealer from conducting its business "at any other location than authorized by its license."

of information that Kerbeck sells the vehicle in question and other Corvettes at its New Jersey location, is clearly constitutionally protected commercial speech. See *Swedenburg v. Kelly*, 358 F.3d 223 (Cir.2d2004), *cert. granted*, —— U.S. ——, 124 S.Ct. 2391, 158 L.Ed.2d 962 (2004) (statute prohibiting advertising of alcoholic beverages in New York by unlicensed persons violates free speech guarantees of the First Amendment.)

Judge FRIEDMAN joins in this dissent.