151 A.3d 1020

**CITY OF PHILADELPHIA, Appellee**

v.

**Nathan LERNER, Appellant**

**No. 26 EAP 2015**

Supreme Court of Pennsylvania.

ARGUED: March 8, 2016

RESUBMITTED: August 17, 2016

DECIDED: November 22, 2016

606

J. Matthew Wolfe, Law Offices of J. Matthew Wolfe, PC (The), 4256 Regent Sq., Philadelphia, PA 19104, for Nathan Lerner, Appellant.

Kelly Susan Diffily, City of Phila Law Dept., 1515 Arch St Fl 17, Philadelphia, PA 19102, for City of Philadelphia, Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE WECHT [1]

Nathan Lerner appeals the Commonwealth Court's order denying his request for relief. We granted allocatur to address the following issue:

[Whether t]he Commonwealth Court [properly] decided that [it was] constrained by its own decision in Krug v. City of Philadelphia, 152 Pa.Cmwlth. 475, 620 A.2d 46 (1993)[,] to sustain a judgment for a tax assessment where the Common Pleas Court found that there was no rational basis for the amount allegedly owed by the [p]etitioner and the Commonwealth Court stated that the City's tactics may well lack authority in law.

City of Philadelphia v. Lerner, 117 A.3d 1278 (Pa. 2015). We affirm.

In September 2004, an anonymous informant sent the City of Philadelphia a letter claiming that Lerner was concealing taxable business income from the City. Attached to the letter were photocopies of checks made payable to Lerner. Several of these checks were issued by Lerner's alleged business partner, Lester Goldstein. Notes of Testimony ("N.T."), 6/26/2013, at 138–42. The City proceeded to investigate the anonymous tip.

In auditing Goldstein, the City discovered that Lerner had business interests in two real estate holding companies: Elco Associates ("Elco") and LeGo Associates ("LeGo"). The City also learned that Goldstein and Lerner had entered into a $94,000 "combined loan agreement" in late 2002 concerning these two entities. N.T. at 98. Pursuant to a separate contract, which was attached to the combined loan agreement, Lerner transferred to Goldstein an $85,000 partnership interest in LeGo. The audit also revealed a 2006 supplemental agreement between Lerner and Goldstein. In that agreement, Lerner disclaimed his interests in two properties: 4507 Chester Avenue and 280 West Walnut Lane.[2] N.T. at 99.

1. This matter was reassigned to this author.
2. Lerner testified that he resides at 4507 Chester Avenue, but does not pay rent either to Goldstein or to LeGo. Instead, Lerner's monthly rent

In February 2006, the City sent Lerner a letter alleging that he had failed to pay Philadelphia's net profits tax and/or business income and receipts tax. The letter instructed Lerner to submit copies of his federal tax returns from the prior five years, to complete an attached worksheet, and to remit payment to the City within thirty days. The letter stated that noncompliance would result in the City's filing of an enforcement action. The City never received a response from Lerner.[3] Approximately one month later, the City sent Lerner a "final notice," stating that it would institute collection proceedings if Lerner failed to submit copies of his federal tax returns within ten days. Lerner ignored the notice.

In November 2006, the City sent Lerner a delinquent tax bill, which estimated that Lerner's net business income was $150,000.00 per year. N.T. at 29–32. This number apparently was not tied to any specific information in the City's possession because, without Lerner's tax records, the City had no idea how much Lerner's businesses earned. The City hoped that, confronted with an exorbitant assessment, Lerner would hand over his business records. But this failed to get Lerner's attention. He simply ignored the bill.

Eventually, the City brought a collection action. When Lerner failed to answer the City's complaint, the City obtained a default judgment. R.R. at 3b. Soon after, Lerner discovered that a default judgment had been entered against him. He moved to open that judgment, arguing that the City's service of process had been defective. The trial court opened the judgment on December 24, 2009. Six days later, Lerner sent the City a letter stating that he had never received the delinquent tax bill that the City had mailed to him three years earlier. On January 7, 2010, the City sent Lerner another copy of the bill. Lerner admitted that he received this copy.

is "deducted from the amount that [Goldstein] pays [Lerner] in interest." N.T. at 142, 144.

3. Although Lerner testified that he mailed a response, the City never received it. N.T. at 45. Furthermore, the trial court found Lerner's testimony to be self-serving and incredible, id. at 244, and the response Lerner allegedly mailed to the City was not admitted into evidence. Id. at 221–22.

On February 2, 2010, the City reinstated and served on Lerner its collection action complaint. R.R. at 3b. The City made numerous attempts to meet with Lerner in person to resolve his case, but Lerner refused the City's offers. N.T. at 64–67, 77–78. Approximately nine months later, on November 10, 2010, Lerner filed a petition for review with the City's Tax Review Board. The Board held a hearing, concluded that it lacked jurisdiction in light of the collection action pending in the trial court, and dismissed Lerner's petition. Lerner appealed the Board's dismissal to the trial court, which consolidated Lerner's appeal with the City's collection action. Notably, the trial court later quashed Lerner's appeal after he refused to pay for a transcript of the administrative hearing.[4] This effectively severed the collection action from Lerner's appeal. The Commonwealth Court affirmed the trial court's order quashing Lerner's appeal. Lerner's appeal from the Board's determination that it lacked jurisdiction over Lerner's petition for review is not presently before us.

Lerner sought to delay the City's collection action with onerous discovery requests and frivolous filings. He served hundreds of interrogatories, requests for admissions, and requests for production of documents. Meanwhile, Lerner simultaneously disregarded the City's discovery requests and refused to disclose information about his income, expenses,

---

4. The trial court directed Lerner to order and to pay for a transcript of the hearing before the Board. In a case management order, the trial court cautioned Lerner that "[f]ailure to order the transcript will result in the dismissal of the appeal absent good cause shown." See Appeal of Nathan Lerner, 515 C.D. 2013, slip op. at 2, 2014 WL 1370308 (Pa. Cmwlth. April 7, 2014). When Lerner still had not ordered the transcript months later, the trial court ordered him to do so within twenty days. Lerner agreed to comply with the court's order. Nonetheless, another three months passed without Lerner ordering the transcript. The City eventually filed a motion to quash the appeal. Lerner responded with a ninety-four page "Answer" wherein he explained that he decided not to order the transcript (in violation of the court's order) because he unilaterally chose to deem it "moot." The trial court quashed Lerner's appeal, admonishing him for his "attempts to forestall the ultimate conclusion in the underlying tax appeal by ignoring the [c]ourt's [o]rder to pay for the transcript necessary for disposition of this matter." Appeal of Nathan Lerner, 2013 WL 2300897, *4 (C.P. Phila. May 2, 2013).

assets, and business interests. When the trial court ordered Lerner to comply, he violated the court's order. As a result, the court precluded Lerner from entering any evidence at trial that he had not disclosed to the City.

Prior to trial, the City filed a motion *in limine* to preclude Lerner from challenging the underlying tax assessment. The City cited Krug v. City of Philadelphia, 152 Pa.Cmwlth. 475, 620 A.2d 46 (1993) for the straightforward proposition that a taxpayer who has not appealed his or her assessment to the Tax Review Board cannot challenge that assessment in a later collection action. See id. at 48–49 ("When the City files a civil action in a common pleas court to collect delinquent wage taxes, and the taxpayer never appealed the assessment for the wage taxes to the Board, all defenses against the tax assessment which should have been raised before the Board are waived and, thus, may not be interposed against the City's collection action."). Lerner did not file a response to the City's motion *in limine*.[5] The trial court granted the City's motion, thereby precluding Lerner from challenging the assessment of his tax liability at trial.

On June 26, 2013, the parties proceeded to a bench trial. Denise Reynolds, a revenue collection manager with the Philadelphia Department of Revenue, testified for the City. When asked how the City determines net business income if a taxpayer refuses to submit the necessary records, Reynolds candidly replied that her supervisor "really just makes [it] up." N.T. at 43–44. At the conclusion of trial, the court awarded the City $280,772.67, which included principal liability of $74,907, $85,828.05 in interest, and $120,037.62 in penalties. N.T. at 11. Although the City's tax assessment was, as the trial judge characterized it, "basically an amount pulled out of

5. Lerner responded to an earlier motion *in limine* that the City filed. In that motion, the City argued that Krug precluded Lerner from challenging the underlying tax assessment. See Memorandum in Support of the City's Motion *In Limine*, 8/8/2012, at 4–6. In his response to the City's motion, Lerner argued only that the City's business tax assessment "is grossly and transparently defective," and that he never received a copy of the original assessment. See Lerner's Response to the City's Motion *In Limine*, 8/24/2012, at 3–7. At no point did Lerner discuss or attempt to distinguish Krug.

the sky," the trial court concluded that Lerner had waived his right to challenge that assessment when he failed to timely petition the Board for review. Id. at 259–60, 265 ("Since the failure to strictly pursue the administrative remedy precludes parties from subsequently asserting defense[s] to a claim, [Lerner] cannot raise defenses here because he did not raise it at the administrative level."); see Krug, supra.

Lerner filed a post-trial motion, wherein he argued that the "judgment in this matter is not supported by substantial evidence and is against the weight of the evidence." See Lerner's Post–Trial Motion, 7/8/2013, at ¶ 10. Lerner chose to focus on this issue even though the trial court itself agreed that the City's assessment lacked evidentiary support. Lerner never asserted that the trial court erred in granting the City's motion in limine, nor did he take issue with the trial court's reliance upon Krug.

After the court denied his post-trial motion, Lerner filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). In his concise statement, Lerner simply incorporated by reference the issue that he raised in his post-trial motion, to wit, whether the City's tax assessment was supported by substantial evidence. In its Rule 1925(a) opinion, the trial court again cited Krug and explained that "the validity of the assessment and whether [Lerner] is liable for the delinquent taxes are no longer [at] issue because [Lerner] waived his right to challenge them." Trial Court Op., 10/22/2013, at 10.

On appeal to the Commonwealth Court, Lerner argued for the first time that the trial court's reliance upon Krug was misplaced. Specifically, Lerner now decided to assert on appeal that a taxpayer who fails to exhaust his or her administrative remedies may nonetheless challenge a tax assessment in a subsequent collection action when the taxing authority's own evidence demonstrates that the assessment has no basis in fact. Although Lerner espouses the same argument before this Court, he has not preserved it. See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). In Commonwealth v.

Hill, 609 Pa. 410, 16 A.3d 484 (2011), we reaffirmed the well-settled, bright-line rule:

[A]ny issues not raised in a Rule 1925(b) statement will be deemed waived; the courts lack the authority to countenance deviations from the Rule's terms; the Rule's provisions are not subject to *ad hoc* exceptions or selective enforcement; appellants and their counsel are responsible for complying with the Rule's requirements[.]

Id. at 494.

In granting the City's motion *in limine*, the trial court determined that Lerner had waived his right to challenge the underlying tax assessment by failing to exhaust his administrative remedies. At the trial court level, Lerner never argued that Krug was inapposite or that an exception to the exhaustion requirement applied. Rather, Lerner consistently asserted—before, during, and after trial—that the City's tax assessment lacked an evidentiary basis. See, e.g., Lerner's Post-Trial Motion, 7/8/2013, at ¶ 3 (arguing that "the assessment that [the City] prepared and forwarded to [Lerner] was a figure that they simply made up and had no basis in any evidence"). But now, on appeal before this Court, Lerner argues that his failure to exhaust his administrative remedies within the Department of Revenue did not prevent him from challenging the City's tax assessment. It could not be more obvious that these are utterly distinct contentions. The former is a substantive challenge to the City's assessment, whereas the latter concerns the trial court's jurisdiction to hear such a challenge in the first place. By failing to comply with Rule 1925(b), Lerner waived the issue that he now requests this Court to address.

The trial court correctly precluded Lerner from challenging the City's assessment due to his failure to exhaust administrative remedies. It is well-settled that a party may not seek judicial resolution of a dispute until he or she has exhausted available administrative remedies. Canonsburg Gen. Hosp. v. Dep't of Health, 492 Pa. 68, 422 A.2d 141, 144 (1980); see 1 Pa.C.S. § 1504 (providing that statutory remedies "shall be strictly pursued"); S.E. Penna. Transp. Auth. v. City of Phila-

delphia, 627 Pa. 470, 101 A.3d 79, 90 (2014) (citing Bayada Nurses, Inc. v. Commonwealth, Dep't of Labor and Indus., 607 Pa. 527, 8 A.3d 866, 875 (2010)). In light of this rule, we have explained that "[a] taxpayer who does not exhaust the remedy provided before an administrative board to secure the correct assessment of a tax [ ] cannot thereafter be heard by a judicial tribunal to assert its invalidity." Commonwealth, to Use of Unemployment Compensation Fund v. Lentz, 353 Pa. 98, 44 A.2d 291, 293 (1945) (quoting Gorham Mfg. Co. v. State Tax Comm. of New York, 266 U.S. 265, 269–70, 45 S.Ct. 80, 69 L.Ed. 279 (1924)); see Commonwealth, Dep't. of Rev., Bureau of Cty. Collections v. Hitzelberger, 419 Pa. 354, 214 A.2d 223, 226 (1965) (finding taxpayers lost right to challenge imposition of tax where they failed to pursue available statutory remedy).

Essentially, Lerner urges us to craft a special exception for him. Appellant's Brief at 19. We decline to do so. To afford Lerner relief would permit litigants freely to skip the administrative process and attempt another bite at the tax apple in our trial courts.

Given sufficiently troubling factual circumstances, this "Lerner Exception" could be invoked to justify a party's noncompliance with virtually any substantive, procedural, or jurisdictional rule. In Krug, for example, a taxpayer alleged that he did not owe Philadelphia wage taxes because he neither worked nor lived in the City. Lerner's rationale would seem necessarily to suggest that Krug was wrongly decided. But the holding in Krug was correct. And it was correct for the same reason that the lower courts in this case were correct: the Philadelphia Tax Review Board has exclusive original jurisdiction over challenges to the City's tax assessments. Cherry v. City of Philadelphia, 547 Pa. 679, 692 A.2d 1082, 1084 (1997) (citing Phila. Code § 19–1702(1)). A taxpayer may not choose to forego, flout, or leapfrog that process and instead simply opt later to seek judicial resolution of a waived challenge at his leisure.

Lerner asserts that reversal is necessary to prevent a "fraud" in the legal process. See Appellant's Brief at 18–19. But that process consists of rules, and Lerner has flouted

them at every turn. Throughout this litigation, Lerner has violated court orders, abused the discovery process, and overwhelmed the lower courts with frivolous pleadings, motions, and interlocutory appeals. Ad hoc and idiosyncratic exceptions to legal rules will not promote public confidence or maintain the integrity of the judicial process.

Because Lerner has waived the issue that he now requests this Court to review, the Order of the Commonwealth Court is affirmed.

Justices Baer, Dougherty and Mundy join the opinion.

Chief Justice Saylor files a dissenting opinion in which Justices Todd and Donohue join.

Justice Donohue files a dissenting opinion in which Chief Justice Saylor and Justice Todd join.

CHIEF JUSTICE SAYLOR, Dissenting

I join Justice Donohue's dissenting opinion. To the degree that the majority premises its disposition upon the doctrine of waiver, I offer the following comments.

When addressing concerns about issue preservation and presentation, my own thoughts align with those courts which remain "mindful of the prophylactic and prudential origins of the doctrine." *Huber v. Taylor*, 469 F.3d 67, 75 (3d Cir. 2006). For example, in the federal judicial system, the doctrine of plain error, as well as discretionary decision-making authority invested in the courts of appeals, continue to serve as safety valves to alleviate the potential for injustice.[1]

1. *See, e.g.*, Fed. R. Crim. P. 52(b) (providing for consideration of "[a] plain error that affects substantial rights" even though the error "was not brought to the court's attention"); *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases[;] ... [c]ertainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where 'injustice might otherwise result.' " (citations omitted)).

This Court, of course, has moved far away from such prudential roots in the direction of strict enforcement of waiver, for example, via its abrogation of the plain error doctrine and curtailment of relaxed waiver in capital litigation.[2] In decisional law referenced by the majority, the Court also converted what, on its face, appeared to be a discretionary waiver practice pertaining to the filing of statements of matters complained of on appeal, see Pa.R.A.P. 1925 (superseded) ("A failure to comply with such directive *may* be considered by the appellate court as a waiver . . . ." (emphasis added)), into a mandatory waiver. See *Commonwealth v. Hill*, 609 Pa. 410, 422, 16 A.3d 484, 491 (2011) (quoting *Commonwealth v. Lord*, 553 Pa. 415, 420, 719 A.2d 306, 309 (1998), for the proposition that "[a]ny issues not raised in a [statement of matters complained of on appeal] *will* be deemed waived" (emphasis adjusted)).

I note, however, that this particular escalation of waiver precepts generated an outcry from members of the legal community. The controversy was reflected, for example, in resolutions submitted to the Court by the Pennsylvania Bar Association, the Philadelphia Bar Association, and the Allegheny County Bar Association. *See, e.g.*, Pa. Bar Ass'n, Appellate Advocacy Comm. Resolution dated Aug. 22, 2006 (urging the Court to ameliorate its strict waiver practice relative to the submission of statements of matters complained of on appeal, given that "merits resolution of disputes is preferable to waiver and enhances respect for the courts and the law by the parties to the dispute and society generally"). Ultimately, this Court responded by revising the relevant Rule of Appellate Procedure to account for special circumstances. *See* Pa.R.A.P. 1925(c).

2. See *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 260, 322 A.2d 114, 117 (1974) (abolishing the plain or fundamental error doctrine in civil cases); *Commonwealth v. Clair*, 458 Pa. 418, 423, 326 A.2d 272, 274 (1974) (same, for criminal cases); *Commonwealth v. Freeman*, 573 Pa. 532, 560, 827 A.2d 385, 402 (2003) (curtailing the relaxed waiver doctrine in capital direct appeals); *Commonwealth v. Albrecht*, 554 Pa. 31, 45, 720 A.2d 693, 700 (1998) (abolishing relaxed waiver in capital post-conviction matters).

As a general rule, I support the enforcement of waiver constructs as a means to sharpen controversies and maintain fairness to opposing litigants. I would nevertheless recognize exceptions for extraordinary circumstances (as pertain, for example, in the context of Rule of Appellate Procedure 1925, as discussed above). In this regard, harkening back to earlier decisions of this Court, I would submit, the judiciary should retain some latitude to disregard waiver where the alternative is to involve the courts in the enforcement of a fraudulent or sham judgment. *See Cochran v. Eldridge*, 49 Pa. 365, 370 (Pa. 1865) ("[W]hen it is alleged upon adequate proofs that a judgment ... has been obtained by a suppression of truth which it was the duty of the party to disclose or by the suggestion of a falsehood or by any of the indefinite and therefore undefinable means by which fraud may be practised, no court will allow itself, its records, and the process of law to be used as instruments of fraud."); *accord Sherman v. Yiddisher Kultur Farband*, 375 Pa. 108, 120, 99 A.2d 868, 871 (1953) (Musmanno, J., dissenting) ("Every tribunal in the United States does honor to the venerable rule that courts possess inherent power to control, amend, open and vacate their decisions according to circumstance, and especially where vitiated by fraud.").

In the present case, I find the circumstances to be quite extraordinary. It is greatly disconcerting, to me at least, that the City of Philadelphia's Department of Revenue had or has a practice of issuing fictitious and arbitrary tax assessments, designed to frighten citizens, that is so common as to have acquired a name: "jeopardy assessment." N.T., June 26, 2013, at 27; *see also id.* at 43–44 (reflecting the unrebutted testimony of a revenue collection manager that her supervisor engages in a practice of "really just mak[ing numbers] up ... try[ing] to make it real high").[3] There would appear to be no

3. A true jeopardy assessment is a statutorily-authorized, extraordinary measure employed by taxing authorities to address exigent circumstances so that an assessment or collection is not jeopardized by delay. *See, e.g.*, 72 P.S. § 7339(a). This contrasts with the informal conception based on outright contrivance manifested on the present record, whereby Department personnel simply "put [an arbitrary] figure out into our

formal protocol or procedure whereby the resort by Department personnel to artifice is necessarily confined to purported scofflaws. Apparently, at the discretion (or whim) of Department personnel, "jeopardy" (or sham) assessments may be inflicted on the citizenry at large, including those persons who may be lacking in education and/or resources or are otherwise vulnerable.

Whether or not the common pleas court should have permitted inquiry into the Department's pernicious practices underlying a tax assessment in the context of a collection proceeding, the present record comes to this Court as it does. At bottom, I simply do not believe that a court of last resort should in any way permit to be condoned or validated what appears very clearly, on this record, to be an arbitrary judgment obtained via such subversive means. To the extent that our refusal to do so would foster other challenges to tax assessments in Philadelphia, I believe that should be seen as arising as a consequence of the Department's own untenable conduct, and not the appropriate unwillingness of the judiciary to permit it to go unredressed.

Justices Todd and Donohue join this dissenting opinion.

JUSTICE DONOHUE, Dissenting

In this case, the City of Philadelphia came into a Pennsylvania court, forthrightly admitted in its case-in-chief that its claim lacked any evidentiary basis and that the claimed amount was entirely arbitrary and a complete fiction, but nevertheless demanded that the court enter judgment in its favor (which it did). The Majority, in robotic adherence to a rule of efficiency, and without even a mention of this Court's overarching duty to protect and maintain public confidence in the integrity of Pennsylvania's court system, implicitly blesses the City's fraudulent behavior. Because this Court should, without exception, exercise our supervisory authority to en-

data base with the hopes that it will elicit a response from the taxpayer." N.T., June 26, 2013, at 27.

sure that the courts of this Commonwealth retain a steadfast fidelity to honesty and integrity, I must respectfully dissent.

The Majority's statement of the factual predicate for this case is not inaccurate, although it emphasizes and highlights points ameliorative of the City's collection tactic.[1] In the City's civil collection action, Lerner filed an answer in which he contended that the claimed amount due was specious and arose from the City's "tortuous administrative misfeasance and malfeasance." Amended Answer and New Matter and Counterclaim, 8/13/13, ¶ 7. **He was correct.** At the bench trial on June 26, 2013, the City called Denise Reynolds, the City's Revenue Collection Manager. Reynolds testified that Lerner's tax liability was $280,772.60. N.T., 6/26/2013, at 10–20. When asked to explain the basis for this assessment, Reynolds testified that when Lerner did not respond to the request for his federal tax returns, the City created a "jeopardy assessment."[2] Id. at 27. According to Reynolds, the amount of this jeopardy assessment was "not based on any specific informa-

1. As one example, the Majority complains that "[w]ithout Lerner's tax records, the City had no idea how much Lerner's businesses earned." Majority Op. at 608, 151 A.3d at 1022. The Majority does not acknowledge, however, that the City's Department of Revenue Regulations, in accordance with powers conferred by section 8–409 of the Philadelphia Home Rule Charter, authorized the Commissioner of Revenue to examine Lerner under oath and to compel from him by subpoena all "books, papers, and records and copies of tax returns filed with other taxing authorities . . . ." Phila. Dept. of Revenue General Regulations § 305. The certified record in this case does not reflect that the Commissioner ever exercised these powers vis-à-vis Lerner, and instead the Department of Revenue proceeded against Lerner without first obtaining evidentiary support.

2. The term "jeopardy assessment" is found in sections 407.2 and 339 of the Pennsylvania Tax Reform Code of 1971, as amended, 72 P.S. §§ 7407.2 and 7339. The term refers to a situation where the Pennsylvania State Department of Revenue believes that an assessment or collection of a tax deficiency will be jeopardized by delay. Jeopardy assessments are not meant to "scare" a potential taxpayer into compliance. Nor are they intended to be totally fictitious with no basis either for the belief that taxes are owed or the amount thereof. Rather, jeopardy assessments are "[d]esigned for emergency situations in which the failure to act immediately could result in the government's permanent loss of tax revenue." See Note, The Taxpayer's Right to Counsel in Jeopardy Assessments, 56 Tex.L.Rev. 883 (1978). The Philadelphia Code does not authorize even legitimate jeopardy assessments.

tion the [C]ity had," and was instead an arbitrary figure placed in the data base "with the hopes that it will elicit a response from the taxpayer" and "make them compliant." Id. at 41.

In response to further questioning by the trial court, Reynolds offered that the jeopardy assessment was "just something you make up to scare the taxpayer into coming in." Id. at 43. The trial court elicited the following additional testimony:

Q. TRIAL COURT: [W]hat's the basis for the scary number?

A. My manager at the time would have given me a number to produce the gross receipts and net income for the business taxes.

Q. TRIAL COURT: Where would he have gotten that number?

A. He really just makes them up. We try to make it real high. If it's a low balance the taxpayers will say, Okay, fine, I'm going to pay this. We don't want them to do this. We want them to come in and make sure the figures are accurate. We make them high.

Q. TRIAL COURT: In essence, there's no real basis of this number?

A. No, there's not. Just a number.

Id. at 43–44.

Reynolds next testified that the net annual income of $150,000.00 she used to compute the taxes assessed against Lerner was just "a made up figure." Id. at 55–56. The trial court again questioned her, as follows:

Q. TRIAL COURT: Is there a scientific basis or is it just completely, completely arbitrary?

A. It's completely arbitrary—well, for discovery purposes it's completely arbitrary.

\* \* \*

Q. TRIAL COURT: So the only assessment that was done in this case was based upon $150,000?

A. That's correct.

Q. TRIAL COURT: And it's based on a figure with no foundation whatsoever.

A. That's correct.

Id. at 60–61.

After the City rested, Lerner's counsel moved for a directed verdict because the City's evidence demonstrated that the assessment was just a "number picked out of the air to scare somebody." Id. at 164. The trial court agreed with counsel's statement that the City's assessment had no factual basis and was instead "basically an amount pulled out of the sky." Id. at 242–44. The trial court nevertheless concluded that because Lerner had not exhausted his administrative remedies, it was "compelled to enter judgment in favor of the [City]." Id. In its subsequent written opinion, the trial court again indicated that "even though there was no rational basis for the amount owed to [the City]," the "validity of the assessment and whether [Lerner] is liable for the delinquent taxes are no longer in issue because [Lerner] waived his right to challenge them." Trial Court Opinion, 10/22/13, at 10–11. The Commonwealth Court affirmed on the same basis, noting that while Lerner's challenges to the City's "fictional assessment" had merit and the City's "strong arm collection tactics may well lack authority in law," it could not reach the merits of Lerner's arguments. City of Philadelphia v. Nathan Lerner, 2014 WL 10298894 (Pa. Commw. Dec. 11, 2014) (unpublished memorandum).

In my view, these decisions of the courts below reflect an egregious misunderstanding of a fundamental principle that must guide our courts: to maintain public confidence, courts of this Commonwealth must retain their fidelity to honesty and integrity. It is true that a party generally must exhaust its administrative remedies before the right of judicial review arises. Feingold v. Bell of Pa., 477 Pa. 1, 383 A.2d 791, 793 (1977); Pa. Indep. Oil & Gas Ass'n v. Com., Dep't of Envtl. Prot., 135 A.3d 1118, 1129 (Pa. Commw. 2015). The doctrine of exhaustion of administrative remedies is a court-made rule [3]

3. The rule also has statutory origins, dating as far back to the Act of 1806, 46 P.S. § 156 (repealed), which stated that when a statute

designed to promote judicial efficiency, as it prevents premature judicial intervention into matters that may well be resolved through the administrative process. Empire Sanitary Landfill, Inc. v. Com., Dep't. of Envtl. Res. 546 Pa. 315, 684 A.2d 1047, 1053 (1996). Pennsylvania courts have consistently held that the doctrine of exhaustion of administrative remedies applies to disputes relating to the assessment of taxes by the City's Department of Revenue. See, e.g., City of Phila. v. Hennessey, 48 Pa.Cmwlth. 600, 411 A.2d 567 (1980); Santoro v. City of Philadelphia, 59 Pa.Cmwlth. 114, 429 A.2d 113 (1981); City of Phila. v. Kenny, 28 Pa.Cmwlth. 531, 369 A.2d 1343 (1977); City of Phila. v. Sam Bobman Department Store, 189 Pa.Super. 72, 149 A.2d 518, 521 (1959); City of Phila. v. Nu-Tech Development Corp., 1988 WL 679775 (C.C.P. Phila. January 19, 1988); City of Phila. v. J. Berenato Metal Finishing Co., Inc., 1985 WL 384554 (C.C.P. Phila. April 29, 1985). Krug v. City of Phila., 152 Pa.Cmwlth. 475, 620 A.2d 46 (1993) is another in this line of cases.

Both the trial court and the Commonwealth Court believed that the Krug line of cases compelled the entry of judgment in favor of the City. They both determined that Lerner's failure to exhaust his administrative remedies precluded him from asserting any defense to the City's claim. In so concluding, however, the courts below failed to recognize a crucial distinction between those cases and the one presently pending—the City's admission, made during its case-in-chief, that its tax assessment was an outright scam—a fabricated "jeopardy assessment" contrived solely to scare Lerner.[4] Because the

provides a remedy by which a right may be enforced, no other remedy than that afforded by the statute can be used. The current version of this statute, 1 Pa.C.S.A. § 1504, which is similar to its predecessor, has application here since the Philadelphia Home Rule Charter, pursuant to which the Tax Review Board was created, has the status of an act of the General Assembly. See Addison Case, 385 Pa. 48, 122 A.2d 272, 275–76 (1956); Gans v. City of Phila., 43 Pa.Cmwlth. 635, 403 A.2d 168, 170–71 (1979).

4.  In its appellate brief filed with this Court, the City now contends that its assessment in this case was a permissible estimate based on the best evidence available. Brief of the City at 34–38. The City's own evidence at trial, however, demonstrated that the $150,000.00 annual net income upon which the assessment was calculated was an entirely "made-up"

City established that its assessment was fabricated in its case-in-chief, its admission of a scam preceded any attempt by Lerner to assert a defense.

Neither Krug nor any of the other above-cited cases presented courts with uncontroverted evidence offered by the plaintiffs, namely that the assessments at issue were fraudulent and lacked any factual basis.[5] This case, in significant contrast, presents an extraordinary circumstance—a plaintiff in a civil collection action whose witness at trial forthrightly acknowledges that the claimed monetary award is entirely arbitrary and without any evidentiary foundation whatsoever.

The doctrine of exhaustion of administrative remedies promotes judicial efficiency, and its continued application is not in question here. But it is not sacrosanct, and as a rule of efficiency it does not, and cannot, trump the integrity of the judicial process. To hold otherwise would result in the entry of a judgment based solely upon an admitted scam, an outcome that this Court should never countenance. *Cf.* Commonwealth v. Pagan, 597 Pa. 69, 950 A.2d 270, 282 (2008) ("The function of a trial is to determine the truth . . . .").

As the Commonwealth Court noted, the City's authority to use "strong arm collection tactics" is not presently at issue. What is at issue, however, is a plaintiff who came to a court of law in this Commonwealth to enter a judgment on a fraudulent claim. This we should not allow. No party should be permitted to invoke judicial intervention to collect on an admittedly fraudulent assessment. To maintain public confidence, the courts of this Commonwealth must retain their fidelity to honesty and integrity. *Cf.* In re Franciscus, 471 Pa.

number intended to scare Lerner into cooperation. N.T., 6/26/2013, at 43–61. Without any basis in fact, it was not an estimate.

**5.** To the contrary, in these cases the City consistently presented the trial court with a firm evidentiary basis for the amount of its claim. See, e.g., Santoro, 429 A.2d at 116 (assessments of wage taxes based upon earning information received from the federal agency employing the taxpayers); Kenny, 369 A.2d at 1347 (same); Hennessey, 411 A.2d at 568 (assessment of wage and net profit taxes based upon "information supplied by Hennessey's employer"); Bobman, 149 A.2d at 521 (assessment based upon an audit of the corporation's records).

53, 369 A.2d 1190, 1194 (1977) (this Court must exercise "our supervisory authority to protect and promote the public confidence in our judicial system"). This Court does so on a regular basis, including through the regulation and discipline of judges, attorneys, and persons employed by the judiciary. See, e.g., Matter of Cunningham, 517 Pa. 417, 538 A.2d 473, 480–81 (1988); In re Dobson, 517 Pa. 19, 534 A.2d 460, 465 (1987). We enforce the basic principle of judicial estoppel to uphold the integrity of the court system. See, e.g., In re Estate of Bullotta, 575 Pa. 587, 838 A.2d 594, 596 (2003); In re Adoption of S.A.J., 575 Pa. 624, 838 A.2d 616, 623 (2003); Trowbridge v. Scranton Artificial Limb Co., 560 Pa. 640, 747 A.2d 862, 864–65 (2000). Judgments procured by fraud may be opened at any time and arbitration awards so tainted may be vacated. See Manufacturers and Traders Trust Co. v. Greenville, 108 A.3d 913, 919 (Pa. Super. 2015); 42 Pa.C.S.A. § 7341. The Pennsylvania Constitution entrusts this Court with safeguarding the integrity of the judicial system, and even the appearance of impropriety may be cause for the exercise of King's Bench jurisdiction. In re Merlo, 609 Pa. 598, 17 A.3d 869, 871 (2011).

Lerner preserved the issue presented here. At trial, after the City rested its case, Lerner moved for a directed verdict on the grounds that the City's evidence established that the underlying assessment "had no basis in reality." N.T., 6/26/2013, at 164. In his subsequently filed post-trial motions and Rule 1925(b) statement, Lerner argued that the City had not introduced any evidence to support the assessment, and that it was in fact "simply made up." See Motion for Post–Trial Relief, 7/8/2013, ¶¶ 2–3; Lerner, 2014 WL 10298894, at *4 n.9 ("Lerner's Rule 1925(b) Statement can reasonably be read to include all the issues raised in his brief."). Finally, while Lerner referenced Krug in his presentation to the Commonwealth Court, the focus of his presentation was directed to the issue on which I would base our decision— namely, that the City's assessment was fictitious and without any evidentiary basis.[6]

6. The Majority eviscerates Lerner for his pro se litigation practices. Majority Op. at 612–13, 151 A.3d at 1024–25. This characterization is

The Majority's alarmist contention that a contrary ruling would create a "Lerner Exception" reflects its profound misunderstanding of both the nature of Lerner's claim and the importance of a decision in his favor. A ruling in Lerner's favor would not establish any exception to the doctrines of waiver or exhaustion of administrative remedies. I do not share the Majority's pessimism or concern that litigants would misapprehend the narrowness of a contrary decision, as it would not impact the perimeters of administrative agency law or the finality of administrative agency decisions.

It is, hopefully, the rarest of occasions when a plaintiff comes into a Pennsylvania court, straightforwardly admits in its case-in-chief that it is proceeding arbitrarily and without any evidentiary basis whatsoever, and nevertheless demands that the court enter judgment in its favor on a fictional damage amount. When on the rarest of occasions this precise impropriety does occur, however, the demand must be rejected to preserve the integrity of the courts. Because the Majority refuses to do so, I must dissent.

Chief Justice Saylor and Justice Todd join this dissenting opinion.

---

not entirely false, as the trial court sanctioned him for, inter alia, discovery abuses. I trust, however, that the Majority is not suggesting that Lerner fairly deserved to have a $280,772.67 sham judgment entered against him as a punishment for his intransigence during discovery.